**AT&T CORPORATION, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

Bell Atlantic, US West Communications, Inc., Public Service Commission of the State of New York, et al., Intervenors.

Nos. 99–1538 & 99–1540.

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 2000.

Decided Aug. 1, 2000.

David W. Carpenter argued the cause for appellants. With him on the briefs were Mark E. Haddad, Peter D. Keisler, Daniel Meron, Washington, DC, Mark C. Rosenblum, Roy E. Hoffinger, Basking Ridge, NJ, and Jonathan Jacob Nadler, Washington, DC.

Randall B. Lowe, Renee R. Crittendon, Russell M. Blau, Mark J. Tauber, Michael D. Hays, J. G. Harrington, and John D. Seiver, Washington, DC, were on the briefs for intervenors Prism Communication Services, RCN Telecom Services, Competitive Telecommunications Commission, Close Call America, Inc., and Global NAPs, Inc.

Jonathan E. Nuechterlein, Washington, DC, Deputy General Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were Christopher J. Wright, General Counsel, Spokane, WA, John E. Ingle, Deputy Associate General Counsel, and James M. Carr, Washington, DC, Counsel. Joel Marcus, Counsel, Washington, DC, entered an appearance.

Michael E. Glover, New York City, argued the cause for intervenors Bell Atlantic and U S West Communications, Inc. With him on the brief were Randal S. Milch, Edward Shakin, New York City, Mark L. Evans, Henk Brands, William T. Lake, Lynn R. Charytan, Washington, DC, Dan L. Poole, Englewood, CO, and Robert B. McKenna, Jr., Denver, CO. John H. Harwood, II, Washington, DC, entered an appearance.

Lawrence G. Malone, Pasedena, TX, and Jonathan D. Feinberg, Albany, NY, were on the brief for intervenor Public Service Commission of the State of New York.

Before: RANDOLPH, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge.

Appellants challenge the Federal Communications Commission's approval of an application by Bell Atlantic to provide long distance service in New York, arguing that the company failed to implement two elements of a fourteen-point competitive checklist prescribed by the Telecommunications Act of 1996. The FCC's approval of Bell Atlantic's application was the first time since the 1982 break-up of AT&T that a Bell operating company received regulatory permission to offer long distance service in a state where it provides local telephone service. Finding no defect in the Commission's analysis, we affirm in all respects.

I

Historically, local telephone companies operated as monopolies. "States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). For the better part of the twentieth century, appellant AT&T Corporation provided most local and long distance phone service throughout the country.

In 1974, the United States filed an antitrust action against AT&T alleging "monopolization by the defendants with respect to a broad variety of telecommunications services and equipment in violation of section 2 of the Sherman Act." *United States v. American Tel. and Tel. Co.*, 552 F.Supp. 131, 139 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Following several years of discovery and nearly a full year of trial, AT&T and the government settled. Known as the Modification of Final

Judgment ("MFJ"), the resulting consent decree required AT&T to divest itself of the twenty-two Bell operating companies, or "BOCs," that provided local telephone service.

Consolidated into seven regional holding companies (four today as a result of mergers), the BOCs continued to have a monopoly in local phone service in their respective service areas. Because "there are many ways in which the company controlling the local exchange monopoly could discriminate against competitors in the interexchange [long distance] market," the MFJ prohibited BOCs from offering so-called "interLATA" or long distance service. *AT&T*, 552 F.Supp. at 188. The MFJ left open the possibility that BOCs could someday provide long distance service, but only if they "los[t] the ability to leverage their monopoly power into the competitive [long distance] markets," either "as a result of technological developments which eliminate the [BOCs'] local exchange monopoly or from changes in the structures of the competitive markets." *Id.* at 194. No BOC ever obtained permission to provide long distance telephone service under the MFJ.

This regulatory landscape remained largely unchanged until Congress enacted the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56. That Act fundamentally restructured local telephone markets by ending the BOCs' local monopoly. Designed to "open[ ] all telecommunications markets to competition," the Act established "a pro-competitive, deregulatory national policy framework" that sought to eliminate the barriers that competitive local exchange carriers, known as "CLECs," faced in offering local telephone service. S. Conf. Rep. No. 230, 104th Cong., 2d Sess. 1 (1996). To this end, the 1996 Act requires BOCs to offer CLECs access to their local telephone networks in three ways: by selling local telephone services to competitors at wholesale rates for resale to end users; by leasing network elements to competitors on an unbundled basis; and by interconnecting a requesting competitor's network with their own. *See* 47 U.S.C. § 251(c)(2)-(4). The 1996 Act requires BOCs to offer the latter two services on "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." *Id.* § 251(c)(2)(D), (c)(3). Through any of these three routes, CLECs may offer local phone service in competition with BOCs.

Added by the 1996 Act, section 252 of the Communications Act of 1934 established procedures for CLECs to request and obtain access to network elements and other facilities. The requesting carrier and the BOC "may" first attempt to negotiate an agreement governing the rates, terms, and conditions under which the CLEC accesses the BOC's facilities. *See id.* § 252(a)(1). If the parties reach an agreement, they must submit it to the appropriate state commission for approval. *See id.* § 252(a)(1), (e)(1). If an agreement is not reached, section 252 directs the state commission to arbitrate and resolve the dispute. *Id.* § 252(b)(1), (b)(4)(C). The state commission must "ensure that such resolution and conditions meet the requirements of section 251" and "establish any rates for interconnection, services, or network elements according to subsection (d) of this section." *Id.* § 252(c)(1)-(2). Subsection (d) requires rates to be "based on the cost ... of providing the interconnection or network element (whichever is applicable), and [ ] nondiscriminatory." *Id.* § 252(d)(1)(A). Subsection (f) permits a BOC to file with the appropriate state commission "a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251." *Id.* § 252(f)(1). It also requires states to review such statements for compliance with sections 251 and 252(d). *Id.* § 252(f)(2).

Section 601(a)(1) of the 1996 Act frees BOCs from all restrictions and obligations imposed by the MFJ, including the prohibition against providing long distance ser-

vice. Telecommunications Act of 1996 § 601(a)(1), .Pub.L. No. 104–104, 110 Stat. at 143. To encourage BOCs to open their markets to competition as quickly as possible, the Act permits them to provide "in-region" long distance service (long distance service originating in a state in which they offered local service under the MFJ) if they demonstrate that they have opened their local markets in that state to competition by fulfilling the requirements of section 271. *See* 47 U.S.C. § 271(b)(1). BOCs may immediately begin providing "out-of-region" long distance service (long distance service originating outside the states in which the particular BOC offered local service under the MFJ). *See id.* § 271(b)(2).

Under section 271, a BOC wishing to provide in-region long distance service must apply to the FCC for approval. *Id.* § 271(b)(1). In its application, the BOC must first demonstrate that it has satisfied either section 271(c)(1)(A), known as "Track A," or section 271(c)(1)(B), known as "Track B." To satisfy Track A, the BOC must show that it has entered into an agreement to provide access and interconnection to "one or more unaffiliated competing providers of telephone exchange service ... to residential and business subscribers." *Id.* § 271(c)(1)(A). If no such request for access and interconnection has been made, Track B requires the BOC to show that "a statement of the terms and conditions that the [BOC] generally offers to provide such access and interconnection has been approved or permitted to take effect by the State commission." *Id.* § 271(c)(1)(B).

Once the BOC has shown that it has satisfied either Track A or Track B, it must establish that its offering of services to CLECs meets the fourteen requirements of a "competitive checklist" contained in section 271(c)(2)(B). The checklist incorporates by reference many of the substantive requirements of the Act's local competition provisions, sections 251 and 252, described *supra* at 611–12. *See id.*

§ 271(c)(2)(B). For example, the BOC must demonstrate that it provides "[i]nterconnection in accordance with the requirements of sections 251(c)(2) and 252(d)(1)"; "[n]ondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 252(d)(1)"; "[l]ocal loop transmission ... unbundled from local switching"; "[l]ocal switching unbundled from transport, local loop transmission, or other services"; and "[n]ondiscriminatory access to [ ] 911 and E911 services [and] directory assistance services to allow the other carrier's customers to obtain telephone numbers." *Id.* § 271(c)(2)(B)(i), (ii), (iv), (vi), (vii)(I)-(II). In addition to satisfying the competitive checklist's fourteen requirements, the BOC must demonstrate that it will provide in-region long distance service in accordance with the nondiscrimination and separate affiliate requirements of section 272. *See id.* §§ 271(d)(3)(B), 272. Finally, the BOC must persuade the FCC that "the requested authorization is consistent with the public interest, convenience, and necessity." *Id.* § 271(d)(3)(C).

The statute gives the FCC ninety days to determine whether an applicant has met section 271's requirements, including whether it has "fully implemented the competitive checklist." *Id.* § 271(d)(3). The Commission must "consult with the Attorney General," who shall "provide to the Commission an evaluation of the application using any standard the Attorney General considers appropriate." *Id.* § 271(d)(2)(A). Although "[t]he Commission shall give substantial weight to the Attorney General's evaluation," that evaluation "shall not have any preclusive effect on any Commission decision." *Id.* The FCC must also "consult with the State commission of any State that is the subject of the application in order to verify the compliance of the [BOC] with the requirements [for providing in-region long distance service]." *Id.* § 271(d)(2)(B).

Since passage of the 1996 Act, the FCC has implemented the statute's local compe-

tition provisions through a series of regulations and orders. Of particular relevance to this case, the Local Competition First Report and Order adopted "initial rules designed to ... open[ ] the local exchange and exchange access markets to competition." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499, 15507 ¶ 6 (1996) (*"Local Competition First Report and Order"*). The Local Competition First Report and Order listed a minimum set of network elements that BOCs must provide to competing carriers, established interconnection rules, and adopted a methodology for pricing network elements known as "TEL-RIC" (total element long-run incremental cost). *Id.* at 15514–15 ¶¶ 27–29.

Prior to the filing of the application at issue in this case, the FCC had received and rejected five section 271 applications. It rejected the first because the applicant, SBC Communications, failed to demonstrate that it satisfied Track A. *In the Matter of Application by SBC Communications, Inc., Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In–Region, Inter-LATA Services in Oklahoma*, 12 F.C.C.R. 8685, 8686 ¶ 1 (1997), *aff'd, SBC Communications v. FCC*, 138 F.3d 410 (D.C.Cir. 1998). It rejected the others because the applicants failed to comply with various requirements of the competitive checklist. *See In the Matter of Application of Ameritech Michigan, Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In–Region, Inter-LATA Services in Michigan*, 12 F.C.C.R. 20543, 20546–47 ¶ 5 (1997) (failure to provide nondiscriminatory access to operations support system, interconnection, and 911 and E911 services); *In the Matter of Application of BellSouth Corporation, et al., Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In–Region, InterLATA Services in South Carolina*, 13 F.C.C.R. 539, 547 ¶ 14 (1997) (failure to (1) provide nondiscriminatory access to operations support

systems, (2) provide unbundled network elements in a manner that permits competing carriers to combine them through collocation, and (3) offer certain retail services at discounted rates), *aff'd, BellSouth Corp. v. FCC*, 162 F.3d 678 (D.C.Cir.1998); *In the Matter of Application by BellSouth Corporation, et al., Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In–Region, Inter-LATA Services in Louisiana*, 13 F.C.C.R. 6245, 6246–47 ¶ 1 (1998) (failure to provide nondiscriminatory access to operations support system and to make telecommunications services available for resale); *In the Matter of Application of BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc., for Provision of In–Region, Inter-LATA Services in Louisiana*, 13 F.C.C.R. 20599, 20605 ¶ 10 (1998) (failure to provide nondiscriminatory access to operations support system and unbundled network elements). After oral argument in this case, however, the Commission approved SBC Communications's application to provide long distance service in Texas. *In the Matter of Application by SBC Communications, Inc., Southwestern Bell Tel. Co., And Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In–Region, InterLATA Services in Texas*, FCC No. 00–238 (June 30, 2000).

Bell Atlantic filed its application to provide in-region long distance service in New York on September 29, 1999. By then, the Supreme Court had invalidated that portion of the Local Competition First Report and Order, specifically Rule 319, which listed the network elements that BOCs must provide to competitors. *Iowa Util. Bd.*, 119 S.Ct. at 734–36. According to the Court, "the FCC did not adequately consider the 'necessary and impair' standards [of section 251(d)(2) of the statute] when it gave blanket access to these network elements." *Id.* at 734. Because Bell Atlantic filed its application while the Commission

was still revising its network element rule in response to the Supreme Court's vacatur, the company agreed to demonstrate compliance with the vacated rule. *See In the Matter of Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act to Provide In–Region, Interlata Service in the State of New York,* 15 F.C.C.R. 3953, 3966–67 ¶ 30 (1999) (*"Bell Atlantic"*). When this opinion was in page proofs, the Eighth Circuit, acting on remand from the Supreme Court's decision in *Iowa Util. Bd.,* invalidated the TELRIC pricing methodology. *See Iowa Util. Bd. v. FCC,* 219 F.3d 744 (8th Cir.2000). By basing rates on hypothetical rather than actual costs, the court held, the TELRIC methodology forced BOCs to charge less for network elements than Congress intended. *Id.* at 612–14. *That decision has no effect on this case, however, because Bell Atlantic has in fact shown compliance with the TELRIC methodology, just as it did with the vacated Rule 319.*

The Bell Atlantic application represented the culmination of more than two years of work by the company and the New York Public Service Commission ("NYPSC"). After Bell Atlantic submitted a draft application in February 1997, the NYPSC commenced collaborative proceedings involving the company and its competitors to open New York's local exchange market to competition. The NYPSC also issued an order establishing rates for access to certain Bell Atlantic network elements. Spanning over one hundred pages, that order set rates for local loops, local switching, tandem switching, interoffice transport, signal control points, etc. *Opinion and Order Setting Rates for First Group of Network Elements,* Op. No. 97–2 (N.Y.PSC Apr. 1, 1997) (*"1997 NYPSC Order"*).

At about the same time, the NYPSC began developing performance measures and service quality standards to assess whether Bell Atlantic was providing the nondiscriminatory access to its network that the 1996 Act requires. *Bell Atlantic,* 15 F.C.C.R. at 3959 ¶ 11. The NYPSC also hired the consulting firm KPMG to test Bell Atlantic's operations support systems for processing orders from Bell Atlantic's competitors. After extensive testing, during which Bell Atlantic corrected many problems, KPMG concluded that the company's operations support systems could adequately accommodate "reasonable, anticipated commercial volumes" of competitors' requests for network access. *Id.* at 3959 ¶ 10.

On December 21, 1999, the FCC approved Bell Atlantic's application to provide long distance service in New York. The Commission began by observing that "[t]he well established pro-competitive regulatory environment in New York in conjunction with recent measures to achieve section 271 compliance has, in general, created a thriving market for the provision of local exchange and exchange access service. Competitors in New York are able to enter the local market using all three entry paths provided under the Act." *Id.* at 3959 ¶ 13. The FCC cited Bell Atlantic's estimates that competitors serve over one million phone lines in New York. *Id.* at 3960 ¶ 14. According to the Department of Justice, moreover, CLECs in New York served approximately 8.9 percent of access lines as of June 1999, an amount "significantly larger than the national average of less than five percent." *Evaluation of the United States Department of Justice* 9 (Nov. 1, 1999) (*"DOJ Evaluation"*).

Relying on uncontested evidence that Bell Atlantic had entered into interconnection agreements with several competing New York carriers, the Commission determined that the company had satisfied Track A. *Bell Atlantic,* 15 F.C.C.R. at 3977 ¶ 62. The Commission next examined Bell Atlantic's compliance with the fourteen components of the competitive checklist, concluding that the company had "fully implemented" each. 47 U.S.C. § 271(d)(3)(A)(i). The Commission also

found that Bell Atlantic had demonstrated that it would comply with the separate affiliate and nondiscrimination requirements of section 272. *Bell Atlantic*, 15 F.C.C.R. at 4153 ¶ 403. Finding approval of the company's application to be "consistent with promoting competition in the local and long distance telecommunications markets," the Commission concluded that Bell Atlantic's provision of long distance service in New York would be in the public interest. *Id.* at 4162 ¶ 425.

On December 28, 1999, appellants AT&T and Covad Communications, a provider of high-speed, data-oriented telecommunications services, appealed the FCC's decision pursuant to 47 U.S.C. § 402(b)(6), (9), which gives this court exclusive jurisdiction to review FCC orders relating to applications to provide long distance service under section 271. After this court denied appellants' request for stay pending appeal, *AT&T v. FCC*, Nos. 99–1538, 99–1540 (D.C.Cir. Jan. 4, 2000) (order denying motion for stay), Bell Atlantic began providing long distance service to customers in New York.

AT&T mounts four challenges to the FCC's approval of Bell Atlantic's application, the first two of which Covad joins: (1) Bell Atlantic's prices for certain network elements do not conform to the TELRIC pricing methodology; (2) contrary to the Commission's conclusion, Bell Atlantic fails to provide competitors nondiscriminatory access to two types of unbundled loops, DSL-capable loops and hot cut loops; (3) the company imposes use restrictions on combinations of network elements that violate the 1996 Act; and (4) the company's proposed script for handling calls requesting new service or changes to existing service conflicts with section 272's nondiscrimination safeguards. Supported by intervenors NYPSC, Bell Atlantic, and U S West, the FCC argues that the company has satisfied both the competitive checklist and section 272's nondiscrimination safeguards. We consider each of appellants' arguments in turn.

## II

Section 271's competitive checklist directs the FCC to determine whether Bell Atlantic's rates (which have been approved by the NYPSC) comply with section 252's requirement that the rates be "just and reasonable" and "based on the cost ... of providing the ... network element." 47 U.S.C. § 252(d)(1), (d)(1)(A)(i). The FCC considers section 252 satisfied only if the rates conform to TELRIC. *See Bell Atlantic*, 15 F.C.C.R. at 4081 ¶ 237; *see also Local Competition First Report and Order*, 11 F.C.C.R. at 15844 ¶ 672. A forward-looking methodology, TELRIC bases rates on "the cost of operating a hypothetical network built with the most efficient technology available." *Iowa Util. Bd.*, 119 S.Ct. at 728 n. 3. TELRIC is not a specific formula, but a framework of principles that govern pricing determinations. "[W]hile TELRIC consists of 'methodological principles' for setting prices, states retain flexibility to consider 'local technological, environmental, regulatory, and economic conditions.' " *Bell Atlantic*, 15 F.C.C.R. at 4084 ¶ 244 (quoting *Local Competition First Report and Order*, 11 F.C.C.R. at 15812). In other words, while state commissions use TELRIC to establish rates, application of TELRIC principles may result in different rates in different states.

The FCC does not conduct de novo review of state pricing determinations in section 271 proceedings, nor does it adjust rates to conform with TELRIC. *See Bell Atlantic*, 15 F.C.C.R. at 4084 ¶ 244. It assesses only whether those rates comply with basic TELRIC principles. In language critical to this case, the FCC described its role this way:

> In reviewing state pricing decisions in the context of section 271 applications, we will not reject an application because isolated factual findings by a commission might be different from what we might have found if we were arbitrating the matter under section 252(e)(5). Rather,

we will reject the application only if basic TELRIC principles are violated or the state commission makes clear errors in factual findings on matters so substantial that the end result falls outside the range that the reasonable application of TELRIC principles would produce.

*Id.*

Neither AT&T nor Covad challenges the TELRIC standard. They claim instead that rates established by the NYPSC for leasing three network elements—switches, voice grade loops, and DSL-compatible loops—violate TELRIC.

■ We review the FCC's TELRIC compliance determinations pursuant to the arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A); *Achernar Broad. Co. v. FCC,* 62 F.3d 1441, 1445 (D.C.Cir.1995) (applying arbitrary and capricious standard to FCC action). Highly deferential, that standard presumes the validity of agency action, requiring us to determine whether the agency has considered the relevant factors and "articulate[d] a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks omitted). We "may reverse only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment." *Kisser v. Cisneros,* 14 F.3d 615, 619 (D.C.Cir.1994).

■ Three characteristics of section 271 proceedings call for special deference to the FCC. For one thing, not only do section 271 issues "require[ ] a high level of technical expertise," *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), but the Commission must consider those issues in the context of rapid technological and competitive change. As the agency points out, "at any given point at which a section 271 application might be filed, the rapidly changing telecommunications industry will have recently unleashed a handful of new technological challenges and unsettled legal disputes." Appellee's Br. at 12. To deal with these constantly-unfolding changes, the section 271 process "must have some play in the joints." *Id.* Second, unlike most agency decisions that we review, much of the FCC's order is itself a review of a state agency decision. Also possessing a considerable degree of expertise, the NYPSC did a significant amount of background work, such as establishing prices, instituting collaborative proceedings to design provisioning methods, and developing performance measures. Finally, and perhaps most important with respect to appellants' challenges to the NYPSC pricing determinations, enormous flexibility is built into TELRIC. In other words, we decide only whether the FCC's determination that Bell Atlantic's rates do not fall "outside the range that the reasonable application of TELRIC principles would produce" is itself arbitrary or capricious. *Bell Atlantic,* 15 F.C.C.R. at 4084 ¶ 244. *Cf. Patrick Thomas v. NLRB,* 213 F.3d 651, 657 (D.C.Cir. 2000) ("[A] court reviews with deference a Board decision that was itself made with deference to the Union."). Although we thus give substantial deference to the Commission's decision, we emphasize that "[t]his does not mean that our review is toothless but merely that we must be very cautious in entertaining an invitation to reverse." *Patrick Thomas,* 213 F.3d 651, 657.

### Switching costs

■ AT&T and Covad claim that the rates the NYPSC set for switches—the equipment used to direct calls to their destination—violate TELRIC in two respects: first, the rates ignore substantial discounts Bell Atlantic will likely receive on the purchase of new switches, and second, they erroneously include the costs not just of new switches, but of more costly "growth additions" to existing switches.

With respect to the latter argument, appellants claim that because TELRIC contemplates construction of a new network using the most efficient technology, it requires the NYPSC to have used the less costly new switches as the basis for the rates. According to appellants, these two errors caused Bell Atlantic's switch rates to exceed substantially those that proper application of TELRIC would have yielded.

Addressing switching costs in its April 1997 pricing order, the NYPSC began by noting the wide disparity between the estimates provided by Bell Atlantic ($586 per line) and AT&T ($125 per line). Based on that disparity, other evidence in the record, and its own analysis, the agency found "neither figure ... reliable." *1997 NYPSC Order* at 84. "In these circumstances," the NYPSC explained, "[its] staff examined the data on switching costs closely." *Id.* at 85. Starting with the historic cost of switches installed in 1993 and 1994, the agency adjusted that cost downward to reflect the declining price of switches, yielding a per-line price of $192.67. The NYPSC acknowledged that its analysis did not take into account "atypically large discounts" received by Bell Atlantic "from its vendors after 1994 in connection with a major switch replacement program." *Id.* at 85 n. 1. The reason, the agency explained in a subsequent order, was that it understood that Bell Atlantic would not receive such large discounts in the future. *Order Denying Motion to Reopen Phase 1 and Instituting New Proceeding* 3–4 (N.Y.PSC Sept. 30, 1998) ("*1998 NYPSC Order Denying Motion to Reopen*").

More than a year after the NYPSC issued its 1997 order, AT&T and other long distance carriers petitioned the agency to lower switching rates. They relied on evidence, only recently revealed by Bell Atlantic, that it would in fact continue to receive large discounts on purchases of all new switches. Seeking to avoid piecemeal changes to the rates, and explaining that the new information would affect its prior

analysis in several ways, the NYPSC concluded that "[t]he web of interconnected effects argues strongly against making the selective modification urged by the motion without a comprehensive review of switching costs." *Id.* at 11. The NYPSC went on to note that "[w]hile the effect of the adjustment on switching prices cannot be presumed to be trivial—though it might turn out to be so—switching costs in general represent a much smaller component of CLEC expense than do the much more significant link costs." *Id.* at 12. Accordingly, the agency declined to revise the rates, but scheduled a comprehensive review of switching costs to begin in January 1999. *See id.*

The FCC found no problem with the NYPSC's resolution of this issue. "AT&T has presented no evidence to persuade us that New York did not conform to TELRIC principles simply because it failed to modify one input into its cost model." *Bell Atlantic*, 15 F.C.C.R. at 4085 ¶ 245. Sympathetic to the NYPSC's position that "its determination of allowable switch costs was the result of a complex analysis that does not lend itself to simple arithmetic correction through the adjustment of a single input," the FCC concluded that the prospect of future modification makes the rates no less TELRIC-compliant. *Id.*

The FCC's decision seems reasonable to us. Not only are state-agency-approved rates always subject to refinement, but we suspect that rates may often need adjustment to reflect newly discovered information, like that about Bell Atlantic's future discounts. If new information automatically required rejection of section 271 applications, we cannot imagine how such applications could ever be approved in this context of rapid regulatory and technological change. Moreover, both the NYPSC and the FCC agree that adjusting switching rates to reflect discounts is not so simple as subtracting the amount of the discount; it requires other adjustments to the cost model. Under these circumstances, we are comfortable deferring to

the Commission's conclusion that basic TELRIC principles have not been violated and that the NYPSC has not made such "clear errors in factual findings" that switching costs fall "outside the range that the reasonable application of TELRIC principles would produce." *Id.* at 4084 ¶ 244. After all, not only is the $193 per-line switching cost considerably closer to AT&T's proposed $125 than to Bell Atlantic's much higher estimate, and not only do "switching costs in general represent a much smaller component of CLEC expense than do the much more significant link costs" (which appellants have not challenged), *1998 NYPSC Order Denying Motion to Reopen* at 12, but the NYPSC has said it will reexamine switching discounts, ordering refunds if appropriate.

Appellants' challenge to the inclusion of so-called "growth additions" is largely a corollary of their discount argument. At oral argument, FCC counsel explained that growth additions to existing switches cost more than new switches only because vendors offer substantial new switch discounts in order to make telephone companies dependent on the vendors' technology to update the switches. In fact, as far as we can tell from the record, the growth addition issue did not even surface in the NYPSC proceedings until after AT&T, relying on the new evidence about discounts, requested reconsideration of switch costs. Accordingly, we think the Commission reasonably concluded that because failure to reflect discounts did not violate TELRIC, inclusion of growth additions did not either.

*Voice Grade Loops*

■ A loop is " 'a transmission facility between a distribution frame, or its equivalent, in an incumbent LEC central office, and the network interface device at the customer premises.' " *Bell Atlantic,* 15 F.C.C.R. at 4095 ¶ 268 (quoting *Local Competition First Report and Order,* 11 F.C.C.R. at 15691). In plain English, loops are the wires that connect telephones

to the switches that direct calls to their destination. There are many different types of loops: "two-wire and four-wire analog voice-grade loops, and two-wire and four-wire loops that are conditioned to transmit the digital signals needed to provide services such as ISDN, ADSL, HDSL, and DS1–level signals." *Bell Atlantic,* 15 F.C.C.R. at 4095 ¶ 268. The 1997 NYPSC pricing order set rates for Bell Atlantic loops. *1997 NYPSC Order* at Attachment D.

AT&T and Covad challenge the rates for one type of loop—voice grade local loops. They argue that the NYPSC violated basic TELRIC principles by assuming that the "feeder" portion of the loop would always use optical fiber, rather than copper. This assumption, according to appellants, produced rates for leasing loops fifteen percent higher than proper application of TELRIC would have yielded.

AT&T originally advanced this argument in the NYPSC rate proceeding, claiming that copper feeder should always be used for loops less than 9,000 feet long. Rejecting this argument in its 1997 order, the NYPSC based local loop rates on the assumption that fiber feeder would be used for all loops. The agency relied on a 1991 Bell Atlantic study establishing that "the investment costs associated with fiber exceeded those of copper, but the difference was found to be more than offset by the lower provisioning and maintenance costs of fiber." *1997 NYPSC Order* at 83. In its rehearing order, the NYPSC devoted twenty-nine more pages to this issue, reaffirming its conclusion and elaborating on its reasoning. *Opinion and Order Concerning Petitions for Rehearing of Opinion No. 97–2,* Op. No. 97–14 (N.Y.PSC Sept. 22, 1997) ("*1997 NYPSC Rehearing Order*"). Emphasizing TELRIC's forward-looking character, and relying on its own independent analysis, the NYPSC pointed out that while Bell Atlantic's plant includes substantial amounts of copper feeder, "virtually none is being installed on a going-forward basis." *Id.* at 23–24. The

reason, the agency explained, is "fiber's superiority with respect to its initial cost, its ongoing operation and maintenance expense, and its flexibility and reliability." *Id.* at 24. Not only are fiber's material costs lower than copper's for the same capacity, but copper's heavier weight and greater volume make it both more difficult and more expensive to install. *See id.* The smaller space taken up by fiber, moreover, reduces costs substantially, an especially critical consideration in dense cities like New York. *See id.* Finally, fiber offers numerous operational advantages over copper. *See id.* at 25. The NYPSC tied all these factors back to TELRIC: "What TELRIC contemplates is the network that would actually be built, using the most cost-efficient, forward-looking technology available, which would certainly lead us to posit all-fiber feeder." *Id.* at 26.

Largely reiterating the NYPSC's conclusion, the FCC rejected appellants' challenge to the use of fiber feeder. "We have no reason to disagree with the [NYPSC's] conclusion that Bell Atlantic's use of fiber . . . does not make its rates inconsistent with a TELRIC methodology." *Bell Atlantic,* 15 F.C.C.R. at 4087 ¶ 249.

Appellants fault the FCC's decision on a host of largely procedural grounds: the Commission failed to address a detailed AT&T study that proves copper is more cost-effective for shorter loops; it failed to consider AT&T's evidence purportedly showing that other BOCs had conceded that copper is more cost-effective; and it could not have reasonably deferred to the NYPSC's findings because the only evidence the NYPSC relied on (the 1991 Bell Atlantic study) was never placed in the record and the only rationale offered by that agency (that fiber feeder is more economical in dense Manhattan) is "plainly inadequate." Appellants' Br. at 30.

These arguments miss the mark. The question whether the FCC adequately considered AT&T's comments is "subsumed within [appellants'] substantive challenge" to the FCC's conclusion that the assump-

tion of fiber feeder was appropriate, *Chemical Mfrs. Ass'n v. EPA,* 28 F.3d 1259, 1263 (D.C.Cir.1994), and we find no basis for faulting the Commission's decisionmaking on that point. The FCC analyzed the NYPSC's original and rehearing orders, which exhaustively evaluated AT&T's arguments, thoroughly explained fiber's superiority, and relied on far more than the unique characteristics of Manhattan and the 1991 Bell Atlantic study. Based on this analysis, the Commission determined that AT&T did not "present[ ] sufficient evidence to prove that the [NYPSC] erred in its determination." *Bell Atlantic,* 15 F.C.C.R. at 4087 ¶ 249.

Appellants make one additional argument. They claim that in the Universal Service Tenth Report and Order the Commission found copper to be more cost-effective than fiber for short distances. *In the Matter of Federal–State Joint Board on Universal Service; Forward–Looking Mechanism for High Cost Support for Non–Rural LECs,* 14 F.C.C.R. 20156 (1999) ("*Universal Service Tenth Report and Order*"). That order, however, expressly stated that "it may not be appropriate to use [the nationwide values developed in the universal service proceedings] . . . for other purposes, such as determining prices for unbundled network elements." *Id.* at 20172 ¶ 32. Explaining that the universal service model employed nationwide, not state-specific, pricing inputs, the Commission "caution[ed] parties from making claims in other proceedings based upon the input values [adopted in the Tenth Report and Order]." *Id.* In any event, the Tenth Report and Order did not say that copper is more cost-effective. It said only that "*[w]hen* fiber is more cost effective, the model will use it to replace copper for loops that are shorter than 18,000 feet." *Id.* at 20196 ¶ 85 (emphasis added).

Relying on the NYPSC's comprehensive analysis, as the 1996 Act directs, the FCC concluded that Bell Atlantic's use of fiber for voice grade loops conforms with TEL-

RIC. Not only have appellants offered no persuasive reason to disturb that judgment, but we cannot imagine a question more suited for administrative rather than judicial resolution than whether copper or fiber loops are more cost-effective. *See Association of Oil Pipe Lines v. FERC,* 83 F.3d 1424, 1445 (D.C.Cir.1996) ("Because the Commission's analysis required a high level of technical expertise, the court owes deference to the Commission's informed and rationally exercised discretion.").

*DSL Loop Conditioning*

■ "Digital Subscriber Line" or "DSL" technology "describes a 'family of transmission technologies that use specialized electronics at the customer's premises and at a telephone company's central office . . . to transmit high-speed data signals over copper cables.'" *Bell Atlantic,* 15 F.C.C.R. at 4087 ¶ 250 (quoting *Bell Atlantic Affidavit in Support of DSL Links).* Only recently developed, DSL technology "allows transmission of data . . . at vastly higher speeds than can be achieved with analog data transmission." *Bell Atlantic,* 15 F.C.C.R. at 4117 ¶ 316 n. 1000. When competitors seek to provide DSL service over Bell Atlantic loops that exceed a certain length, the company must sometimes "condition" those loops to make them DSL-compatible by removing load coils and bridge taps that interfere with transmission of digital signals. *See id.* at 4088–89 ¶ 252.

Although BOCs have been obligated to provide access to unbundled loops capable of supporting DSL technologies since the Local Competition First Report and Order was issued in 1996, demand for DSL-compatible loops in New York emerged only in the past year. *See id.* at 4117 ¶¶ 316–17. In fact, a Covad witness testifying in late July 1999 explained that Covad had just begun ordering DSL loops. For this reason, the *1997 NYPSC Order* did not address rates for DSL conditioning, so when Bell Atlantic filed its section 271 application in September 1999, the company had in place only the interim conditioning rates that it had filed with the NYPSC just one month earlier.

Responding to increased demand for DSL loops and to complaints from competitors that Bell Atlantic's interim conditioning charges were excessive, the NYPSC initiated fast-track proceedings to set permanent conditioning rates. As a result of those proceedings, the agency significantly reduced Bell Atlantic's interim conditioning charges. It also created a "placeholder" rate subject to future adjustment as the NYPSC conducts further inquiry. *See Order and Opinion Concerning DSL Charges,* Op. No. 99–12 (N.Y.PSC Dec. 17, 1999). Because the NYPSC issued this order only one week before the end of the FCC's ninety-day review period, the Commission's order focuses only on Bell Atlantic's interim rates.

Although concerned that interim rates "create uncertainty," the FCC concluded that "a BOC's application for in-region [long distance service] should not be rejected solely because permanent rates may not yet have been established for each and every element or nonrecurring cost of provisioning an element." *Bell Atlantic,* 15 F.C.C.R. at 4090–91 ¶ 258. "[T]his question," the Commission explained, "should be addressed on a case-by-case basis." *Id.* at 4091 ¶ 258. The Commission listed several factors that led it to conclude that Bell Atlantic's use of interim rates did not preclude a finding of checklist compliance: "[t]he conditioning of DSL loops is a relatively new issue"; the NYPSC "has a substantial track record of setting other applicable prices at TELRIC rates"; "Bell Atlantic's interim rates are subject to refund or true-up if the [NYPSC] determines that they exceed applicable TELRIC-based costs"; and the interim rates applied only to "a few ancillary items" affecting a small percentage of unbundled loops. *Id.* at 4090–91 ¶¶ 258–59. Noting that "[a]t some point, states will have had sufficient time to complete [permanent rate proceedings]," the FCC

warned that it will "become more reluctant to continue approving section 271 applications ·containing interim rates. · It would not be sound policy for interim rates to become a substitute for completing these significant proceedings." *Id.* at 4091 ¶ 260.

AT&T and Covad argue that Bell Atlantic's interim conditioning rates violate TELRIC. "When there is a substantial challenge to a particular rate that has not been previously reviewed by a state commission, the FCC's duty is to determine its lawfulness and grant the application only if it is found lawful." Appellants' Reply Br. at 17.

Because AT&T and Covad's argument rests on their interpretation of section 271, we employ the familiar two-step *Chevron* process. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If "Congress has directly spoken to the precise question at issue," the court "must give effect to the unambiguously expressed intent of Congress." *Id.* In determining whether Congress has spoken to the precise question at issue, we "exhaust the traditional tools of statutory construction." *Natural Resources Defense Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C.Cir.1995) (internal quotation marks omitted). "[I]f the statute is silent or ambiguous with respect to the specific issue," the court must determine whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. In making this determination, we afford substantial deference to the agency's interpretation of the statute because "the responsibilities for assessing the wisdom of ... policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *FDA v. Brown & Williamson Tobacco Corp.*, —— U.S. ——, 120 S.Ct. 1291, 1300, 146 L.Ed.2d 121 (2000) (internal quotation marks and citation omitted). As long as the agency's interpretation is reasonable, we uphold it "regardless whether there may be other reasonable, or even more reasonable, views." *Serono Lab., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C.Cir. 1998).

In support of their argument that section 271 requires the Commission to have denied Bell Atlantic's application on the basis of its interim conditioning rates, appellants rely on section 271(d)(3)'s requirement that the FCC "not approve [an application] unless it finds that ... [the applicant] has fully implemented the competitive checklist." 47 U.S.C. § 271(d)(3). They also point out that the competitive checklist requires Bell Atlantic to offer "[n]ondiscriminatory access to network elements in accordance with the requirements of section[ ] ... 252(d)(1)," which the FCC has interpreted to require TELRIC-compliant rates. *Id.* § 271(c)(2)(B)(ii). Neither provision, however, speaks, as *Chevron* put it, unambiguously to "the precise question at issue": Does the fact that interim rates (reviewed by neither the NYPSC nor the FCC) govern a small component of local loops that has only recently become the subject of competitor demand preclude a finding of checklist compliance?

Moving to *Chevron* step two, we think the FCC has reasonably answered this question in the negative. Rapid advances in technology continuously spark demand for new products and services. *See Bell Atlantic*, 15 F.C.C.R. at 4091 ¶ 259. As a result, competitors may often demand access to new technologies before state agencies are able to set TELRIC-compliant rates—exactly what happened here. Given this fact of life in the telecommunication industry at this early stage of the implementation of the 1996 Act, and given that the FCC has only ninety days in which to act on section 271 applications, the agency's approach strikes a reasonable balance between ensuring that an applicant has

opened local markets to competition by charging just and reasonable rates and not allowing technological developments to become obstacles to an applicant's entry into in-region long distance markets.

In deferring to the Commission's resolution of the interim rate issue, we are influenced by an additional factor. The agency narrowly cabined its acceptance of interim rates to the unique circumstances of this case: emergence of a recently developed technology produced demand for a new service before the state commission had an opportunity to approve permanent rates; the state commission instituted fast-track proceedings to set permanent rates; and those proceedings ended just days before the FCC approved the section 271 application.

### III

Checklist item four requires BOCs to show that they provide competitors with "[n]ondiscriminatory access to network elements," which include local loops, and "[l]ocal loop transmission from the central office to the customer's premises, unbundled from local switching or other services." 47 U.S.C. § 271(c)(2)(B)(ii), (iv). Appellants contend that Bell Atlantic fails to provide nondiscriminatory access to two types of unbundled loops: DSL-capable loops and voice grade, hot cut loops.

### DSL–capable loops

Comments submitted to the FCC opposing Bell Atlantic's application charge the company with failing to provide access to loops capable of supporting DSL technology on a nondiscriminatory basis. For example, Covad summarized its data as follows: "Covad's own, substantiated data shows that for every 100 loop orders it places in New York, only 50% will receive a due date within 72 hours. Of those 50 remaining orders, only 74% (37) will be wired in the central office by the time Bell Atlantic has committed to do so. And of those 37 remaining orders, only 78% (29) of them will actually be provisioned to the

customer's premises on time." The Justice Department was also concerned about Bell Atlantic's provisioning of DSL loops: "As to Bell Atlantic's historical performance in provisioning DSL loops, we are unable to conclude on the current record that Bell Atlantic has demonstrated an acceptable level of performance. It is possible, however, that the Commission may obtain information not currently available to the Department that would support such a conclusion.... [W]e cannot conclude that CLECs currently have access to DSL loops necessary for them to compete effectively." *DOJ Evaluation* at 27–28.

The FCC took a different approach. Acknowledging the concerns about Bell Atlantic's performance with respect to DSL loops, the FCC based its finding of checklist compliance on the company's provisioning of unbundled loops generally, not of DSL-capable loops in particular. In reaching this conclusion, the Commission relied on several factors. To begin with, it observed that although BOCs have been obligated to provide access to DSL-capable loops since 1996, the Commission had not "previously provided guidance to the BOCs as to the type and level of proof necessary in this area to establish compliance with section 271." *Bell Atlantic,* 15 F.C.C.R. at 4117 ¶ 316. Moreover, the Commission explained, "no previous applicant has made a separate showing on the provision of xDSL loops." *Id.* (The "small 'x' before the letters 'DSL' signifies the use of the term as a generic transmission technology." *Id.* at 4087 ¶ 250 n. 818.)

Second, the FCC pointed out that because demand for DSL loops did not surface until 1999, the NYPSC and other state authorities had only recently begun developing and adopting performance standards and measures for DSL loop ordering and provisioning. *See id.* at 4117 ¶ 317. Considering DSL issues for the first time in August 1999, the NYPSC initiated collaborative proceedings to address Bell Atlantic's DSL loop provisioning by defining provisioning methods and de-

veloping DSL-specific performance standards. *See id.* The FCC explained: "Bell Atlantic and competing carriers have agreed to joint testing and provisioning procedures for xDSL loops. Provisioning xDSL loops to competitors involves processes that are more complex than those involved with the provision of a voice-grade loop." *Id.* at 4118 ¶ 319.

Third, DSL loops represent only a "small fraction" of all unbundled loops. *Id.* at 4118–19 ¶¶ 320–21. In support of this finding, the Commission noted that Bell Atlantic provisioned just seven DSL-specific loops in June 1999, fifty-six in July, 449 in August, and 653 in September. *Id.* at 4118 ¶ 320. Although the company also provisioned more than 3,300 premium loops since January 1999 that could "on occasion" be used for DSL service, the FCC was unable to determine what portion, if any, was so used. *Id.* at 4119 ¶ 320 n. 1012. In contrast to the small number of DSL loops, Bell Atlantic provisioned 50,000 unbundled voice grade loops through September 1999. *See id.* at 4119 ¶ 321.

Finally, Bell Atlantic and its competitors (including Covad) submitted conflicting data about Bell Atlantic's provisioning performance. Noting that "[t]he absence of a New York performance benchmark or [NYPSC] reconciliation of conflicting data claims makes it difficult for this Commission to decide between the competing statistics," the FCC explained that different methodologies in calculating the statistics likely accounted for the divergence and "complicate[d] its efforts to analyze the data." *Id.* at 4120 ¶ 326.

"In light of these unique circumstances," the Commission concluded, "we should rely upon Bell Atlantic's overall showing of loop performance in evaluating whether Bell Atlantic has met its burden of demonstrating that it provides unbundled local loops in accordance with checklist item 4." *Id.* at 4121 ¶ 327. Acknowledging that this analysis diverged from the Justice Department's, the FCC explained: "We have given substantial weight to the Department of Justice's views, but nonetheless, based upon our review of the record on loops as a whole, find that Bell Atlantic establishes that it provisions unbundled local loops at a level of performance sufficient for checklist compliance." *Id.* at 4121 ¶ 328. The Commission cautioned, however, that "[i]f xDSL services continue to grow rapidly ... the aggregate loop results will be more heavily influenced by Bell Atlantic's performance in provisioning xDSL-specific loops. If the future aggregate performance declines from current levels, we will take appropriate enforcement action." *Id.* at 4122 ¶ 329.

AT&T and Covad claim that the Commission's reasoning suffers from several flaws. The first is statutory. Section 271, they point out, requires the FCC to determine whether an applicant "has fully implemented the competitive checklist" and denies the FCC the power to "limit or extend the terms used in the competitive checklist." 47 U.S.C. § 271(d)(3)(A)(i), (d)(4). According to appellants, the evidence reveals systemic discrimination with respect to DSL loops, thus precluding a finding that Bell Atlantic "fully implemented" the competitive checklist.

Responding with a *Chevron* argument, the FCC contends that Congress has not spoken to the "precise question" that appellants raise: Must the Commission make a finding of nondiscriminatory access with respect to each type of loop, or does the statute permit the agency to evaluate a BOC's overall loop performance? The Commission argues that the statute speaks generally of nondiscriminatory access to "network elements" and "local loop transmission," and that the statute nowhere unambiguously requires it to make pass-fail evaluations of each category of loop. According to the Commission, the fact that section 271 says "fully implemented," not "substantially complied," does not answer the question of *what* must be fully implemented.

We agree with the FCC that the statute is ambiguous with respect to the precise issue before us. Section 271 does not say that an applicant must show that it provides nondiscriminatory access to each category of loop or to every single loop. The statute requires only that the BOC provide "[n]ondiscriminatory access to network elements" (which include local loops) and "[l]ocal loop transmission." 47 U.S.C. § 271(c)(2)(B)(ii), (iv). It thus leaves open precisely what section 271's nondiscriminatory access requirement means. That the FCC may not "limit or extend the terms used in the competitive checklist," id. § 271(d)(4), changes nothing. The Commission neither "limit[ed]" nor "extend[ed]" the term "local loop transmission," nor did it disregard any checklist item. Rather, it gave content to the statute by defining nondiscriminatory access to unbundled local loops.

Because Congress has not spoken to the precise question at issue, we ask whether the FCC reasonably interpreted section 271 to allow assessment of an applicant's overall provisioning of loops, as opposed to mandating pass-fail analysis with respect to DSL-capable loops. See Chevron, 467 U.S. at 843, 104 S.Ct. 2778. We think it did. To begin with, in reading the term "nondiscriminatory access" not to require a separate showing with respect to DSL-capable loops, the Commission relied on the same characteristics of the DSL loop market that influenced its decision regarding interim rates: "competitors have been ordering xDSL-capable loops in New York for a relatively short period of time; there has been a recent surge in demand; and xDSL-capable loops remain a small percentage of loop orders." Bell Atlantic, 15 F.C.C.R. at 4121 ¶ 327. In addition, the agency explained, "[p]rovisioning xDSL loops to competitors involves processes that are more complex than those involved with the provision of a voice-grade loop." Id. at 4118 ¶ 319. Moreover, not only did the NYPSC institute proceedings to improve Bell Atlantic's DSL performance, but the FCC might have been unable to

complete its work within the ninety-day statutory review period had it been required to make separate determinations with respect to each and every type of loop. As both the Commission and intervenors point out, there are many different types of loops, including two-wire loops, four-wire loops, analog loops, digital loops, fiber loops, and copper loops. See id. at 4095 ¶ 268, 4097 ¶ 275; Bell Atlantic and U S West's Br. at 5. There are also "countless uses to which loops can be put, including residential service, business service, voice service, data service, alarm service, and so on. Under [appellants'] theory, each of these different kinds and uses of loops could become independent checklist items requiring stand-alone satisfaction." Id.

Our conclusion that the FCC's interpretation is reasonable rests, as did the agency's decision, on the "unique factual circumstances" presented by Bell Atlantic's application with respect to DSL loops: demand for DSL loops had only recently surfaced, DSL loops constitute but a small fraction of total loop orders, and provisioning DSL loops involves technical difficulties not encountered in provisioning voice grade loops. See Bell Atlantic, 15 F.C.C.R. at 4119 ¶ 322. Unlike Bell Atlantic, moreover, "[f]uture applicants ... may have the benefit of clearly-defined performance standards and verified performance data.... [and] will have a clear picture of the evidentiary showing [the FCC] would expect for a showing of checklist compliance with respect to xDSL-capable loops." Id. at 4122 ¶ 330 n. 1032. We therefore expect, as did the FCC, that as DSL-capable loops become a larger proportion of unbundled loops, and as performance standards are developed, checklist compliance will require "a separate and comprehensive evidentiary showing with respect to the provision of xDSL-capable loops." Id. at 4122 ¶ 330.

That the Justice Department had a different view about DSL-capable loops does

not undermine the Commission's order. The FCC never disputed the Justice Department's concerns about Bell Atlantic's provisioning of DSL loops. Acknowledging those concerns, the Commission disagreed with the Department about what section 271 required. Interpreting the Telecommunications Act is the FCC's job, not the Justice Department's, a proposition recognized by both Congress and the Department. *See* 47 U.S.C. § 271(d)(2)(A) ("[T]he Attorney General's evaluation ... shall not have any preclusive effect on any Commission decision"); *DOJ Evaluation* at 13 n.25 ("We have examined these facts to assess their impact on the development of competition in New York and have not, however, attempted to determine whether they establish compliance with the legal requirements of the competitive checklist or the Commission's rules, matters which we leave for the Commission's judgment.").

Appellants make one final argument about DSL loops. They claim the FCC improperly relied on Bell Atlantic's promise—made in an ex parte submission shortly before the Commission approved its application—to establish a separate affiliate to provide retail advanced services, such as DSL services. *See Bell Atlantic*, 15 F.C.C.R. at 4123 ¶ 331 n. 1036. In support, they point to this sentence from the Commission's order: "In this case, we have further assurance that competing carriers in New York will have nondiscriminatory access to xDSL-capable loops in the future as a result of Bell Atlantic's commitment to establish a separate affiliate through which it will offer retail advanced services." *Id.* at 4122–23 ¶ 331. Notwithstanding this statement, the record does not support appellants' argument. The Commission rejected Covad's motion to strike Bell Atlantic's ex parte submission, expressly stating that it had not relied on it in approving the application. *Id.* at 3970 ¶ 40. The order itself, moreover, indicates that the Commission did not rely on the Bell Atlantic submission. The order mentions the submission only after concluding that the company provided nondiscriminatory access to loops, and then only in the context of advising future applicants about what they would need to do to obtain approval. *Id.* at 4122–23 ¶¶ 331–33.

### Hot Cut Loops

 When a customer changes its local service provider from Bell Atlantic to a competitor, Bell Atlantic must perform a "hot cut," "manually disconnecting the customer's loop in the Bell Atlantic central office and reconnecting the loop at the competing carrier's collocation space." *Id.* at 4122–23 ¶ 291 n. 925. "The customer is taken out of service while the hot cut is in progress, thereby making the cut 'hot,' although if the cut is successful, the service disruption will last no more than five minutes." *Id.*

AT&T and Covad mount two challenges to the FCC's conclusion that Bell Atlantic provisions hot cut loops in a nondiscriminatory manner. They challenge both the standard the Commission used and the factual basis for the agency's conclusion.

The FCC has developed two standards for determining whether BOCs provide nondiscriminatory access to certain products or services, both of which it has applied in prior section 271 proceedings. When considering "those functions the BOC provides to competing carriers that are analogous to the functions a BOC provides to itself in connection with its own retail service offerings"—*i.e.*, those with retail analogues—the Commission asks whether the BOC has "provide[d] access that is equal to ... the level of access that the BOC provides itself, its customers, or its affiliates, in terms of quality, accuracy, and timeliness." *Id.* at 3971 ¶ 44. With respect to functions lacking retail analogues, the Commission looks "to whether the BOC's performance offers an efficient competitor a meaningful opportunity to compete." *Id.* at 4095 ¶ 269. Because provisioning hot cuts has no retail analogue, the FCC applied the "meaningful

opportunity to compete" standard to Bell Atlantic's hot cut performance. *Id.*

 Use of this standard was erroneous, appellants contend. "The FCC should have required Bell Atlantic to prove that it was providing hot cuts with the least amount of service disruption and missed appointments that is technically and commercially feasible." Appellants' Br. at 45. Appellants derive this standard in the following way. They begin with Rule 311(b), which governs functions having retail analogues: "to the extent technically feasible," the rule says, BOCs must provide access to network elements at the same level of quality as they provide to their own customers. 47 C.F.R. § 51.311(b). Appellants argue that Rule 311(b) applies to hot cuts because the FCC said in the order approving Bell Atlantic's application that the standard for compliance absent retail analogues (as in the case of hot cuts) is no weaker than the standard where there are retail analogues. Accordingly, they argue, the meaningful opportunity to compete standard employed in the former scenario must include a requirement that the BOC take all technically feasible steps to provision hot cut loops. Appellants also contend that their standard is compelled by the statute's requirement that BOCs provide nondiscriminatory access to local loops.

We are unconvinced. Applying to obligations that have retail analogues, Rule 311(b) has nothing to do with obligations, like hot cut provisioning, that have no such analogue. As the FCC points out, the meaningful opportunity standard "is neither stronger nor weaker than the standard for functions with retail analogues. It is simply different, because it requires an objective level of performance rather than a level that varies with each carrier's individual retail performance." Appellee's Br. at 33. Appellants thus may not import Rule 311(b)'s "technically feasible" requirement into the meaningful opportunity to compete standard. Section 271's "nondiscriminatory" requirement, moreover, is

not self-defining. While appellants' definition is plausible, the Commission interprets the word differently, and it is to the Commission that we owe deference.

██ Applying the meaningful opportunity standard, the FCC determined that Bell Atlantic made "a minimally acceptable showing" of checklist compliance with respect to hot cuts. *Bell Atlantic,* 15 F.C.C.R. at 4115 ¶ 309. It found that the company completed over ninety percent of hot cuts within a specified period of time, that fewer than five percent resulted in service outages, and that fewer than two percent of hot cut lines reported installation troubles. *Id.* at 4114–15 ¶ 309. Appellants advance several challenges to this conclusion. Our review is pursuant to the arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A).

Appellants first argue that the FCC failed to give "substantial weight," 47 U.S.C. § 271(d)(2)(A), to the Justice Department's finding that "the number and magnitude of the deficiencies [in Bell Atlantic's hot cut provisioning] are imposing a real constraint on competition through the use of unbundled loops and that significant improvement is needed in this area," *DOJ Evaluation* at 20. We disagree with appellants. The Commission's analysis and the Justice Department's evaluation rested on the same factual findings—those made by the NYPSC—but differed over the standard a BOC must meet to satisfy the statute. As the Justice Department itself explained: "Our assessment of the facts regarding Bell Atlantic's wholesale performance is substantially consistent with the NYPSC's assessment.... To the extent there is a difference between the Department's judgment and that of the NYPSC, it arises largely from the Department's conclusion that needed improvements should be achieved before Bell Atlantic is authorized to provide [long distance service] in New York, rather than relying on post–271 approval regulatory mechanisms to attempt to ensure such improvements." *Id.* at 13–14 (footnote omit-

ted). Moreover, the Department explained: "We have examined these facts to assess their impact on the development of competition in New York and have not, however, attempted to determine whether they establish compliance with the legal requirements of the competitive checklist or the Commission's rules, matters which we leave for the Commission's judgment." *Id.* at 13 n. 25.

The Commission and the Justice Department thus disagreed only about where to draw the line between acceptable and unacceptable hot cut performance. The Commission was satisfied with Bell Atlantic's level of performance; the Department was not. As the Department recognized, line-drawing is the agency's responsibility. Congress required only that the FCC give the Department's evaluation "substantial weight," admonishing that the evaluation should not have "preclusive effect." 47 U.S.C. § 271(d)(2)(A). To accept appellants' argument—particularly where the Justice Department and the FCC agreed on the facts but disagreed about the law—would give the Department's evaluation precisely such preclusive effect.

AT&T and Covad next argue that the FCC failed to give "substantial weight" to the Justice Department's conclusion that Bell Atlantic's hot cut deficiencies had reduced competition in the New York market. But as the Commission noted in the order approving the company's application, "the Department did not specify in what manner and to what extent the New York local exchange market is affected adversely by these problems. Nor did the Department provide any indication as to what level of hot cut performance or what types of improvements Bell Atlantic should be required to demonstrate in order to satisfy section 271." *Bell Atlantic,* 15 F.C.C.R. at 4108 ¶ 297. To be sure, the FCC conducted no detailed analysis of the effect on competition, relying instead on industry-approved metrics (such as on-time performance and service outages) to conclude that Bell Atlantic provided competitors

with a meaningful opportunity to compete. The Commission certainly could have undertaken its own competition studies, but given that it is the agency's responsibility to determine precisely how to measure whether an applicant provides nondiscriminatory access to local loops, we find its reliance on industry-approved metrics neither arbitrary nor capricious.

Appellants also contend that the FCC failed to provide reasoned support for its conclusion that Bell Atlantic met the Commission's performance targets. Noting that the NYPSC advocated a ninety-five percent on-time performance rate, they claim that the Commission failed to support its determination that a ninety percent rate represents a meaningful opportunity to compete. As the FCC points out, however, the NYPSC also said that a ninety percent rate cannot be considered discriminatory. Appellee's Br. at 35. Equally important, the Commission has wide discretion to determine where to draw administrative lines, and appellants point to nothing suggesting that the agency abused its discretion in drawing the line at ninety as opposed to ninety-five percent. *See Department of Health and Human Svcs., Indian Health Service, Oklahoma City v. FLRA,* 885 F.2d 911, 917 (D.C.Cir.1989) ("Because of the need for expertise and judgment, the drawing of the lines between [competing proposals] is ultimately within the jurisdiction of the [agency], which has been vested by Congress with administration of the statute, whose decision must be sustained absent arbitrary action."). The same principle refutes appellants' challenge to the Commission's conclusion that Bell Atlantic satisfactorily performed hot cuts with minimal service outages (five percent) and installation troubles (two percent).

AT&T and Covad next argue that the FCC's conclusion that fewer than five percent of customers suffered service outages caused by Bell Atlantic rests on a legal error, *i.e.,* that the five percent figure did not include service outages where fault

could be attributed to neither Bell Atlantic nor AT&T. Because Bell Atlantic bears the burden of establishing that it has satisfied the competitive checklist, appellants argue, the FCC must assume that the company caused the outages of unattributed origin, raising its error rate to 6.5 percent. But how does attributing outages of unknown origin to Bell Atlantic follow automatically from the proposition that the company has the burden of proof? Appellants never explain this connection. Moreover, we find no reason to disturb the Commission's judgment that Bell Atlantic satisfied its burden of proof. The company offered evidence about the number of service outages, which AT&T attempted to rebut with its own data. Relying on an NYPSC reconciliation of this conflicting data, the FCC concluded that many of the outages cited by AT&T could not fairly be attributed to Bell Atlantic. *See Bell Atlantic,* 15 F.C.C.R. at 4110–11 ¶¶ 302–03. The outages-of-unknown-origin problem thus represents a failure of AT&T's rebuttal evidence, not of Bell Atlantic's proof.

Equally unpersuasive is appellants' argument that "it was absurd for the FCC to find that CLECs have nondiscriminatory access to unbundled loops when unrebutted evidence showed that more than 10 percent of CLEC loop orders result in dropped [directory] listings." Appellants' Br. at 54. The Commission responded to this argument in the order approving Bell Atlantic's application, stating: "We find that Bell Atlantic has taken adequate measures to detect any dropped listings and restore them to the directory assistance database promptly. No other commenter raises this objection, suggesting the difficulty is of little competitive consequence. In fact, several parties support Bell Atlantic's assertion of compliance with this checklist item." *Bell Atlantic,* 15 F.C.C.R. at 4134 ¶ 355 (footnote omitted). Acknowledging that the Justice Department, relying on an AT&T study, had expressed concern about directory listings, the Commission explained that the Department "did not have the benefit of Bell Atlantic's reply [to AT&T's study], which we believe sufficiently rebuts AT&T's claims." *Id.* at 4134 ¶ 356. Although the Commission did not document all problems with AT&T's study, its conclusion finds sufficient support in the record and is neither arbitrary nor capricious.

## IV

■ We turn to AT&T's challenge to the use restrictions Bell Atlantic places on certain combinations of network elements. Bell Atlantic and its competitors use network elements to provide two types of telecommunications services: exchange services, which subscribers use to make calls within local exchange areas (local calls), and exchange access services, which long distance carriers use to originate and terminate long distance calls. Adhering to an NYPSC policy, Bell Atlantic prohibits competing carriers from using a certain combination of unbundled network elements—a combination of loop and transport known as the enhanced extended link or "EEL"—to provide exchange access (long distance) services unless those carriers use those elements primarily to provide exchange (local) services. In other words, Bell Atlantic denies EEL access to carriers seeking to use them either exclusively or predominately for long distance service; those carriers must instead provide long distance service as they had before the 1996 Act—by purchasing special access services from Bell Atlantic. Special access charges for those services exceed what competitive carriers like AT&T would have to pay to lease EELs. Thus this dispute.

The Commission originally considered these use restrictions in its Local Competition First Report and Order, finding them to violate section 251(c)(3)'s requirement that BOCs "provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service." 47 U.S.C. § 251(c)(3).

Because long distance service is a "telecommunications service," the FCC reasoned, BOCs must provide access to network elements to carriers wishing to use them to provide long distance as well as local service. "Although we conclude ... that we have discretion under the 1934 Act, as amended by the 1996 Act, to adopt a limited, transitional plan to address public policy concerns raised by the bypass of access charges via unbundled elements," the FCC explained, "we believe that our interpretation of section 251(c)(3) ... is compelled by the plain language of the 1996 Act." *Local Competition First Report and Order,* 11 F.C.C.R. at 15679 ¶ 356.

In 1999, the Supreme Court vacated the rule listing the network elements BOCs must provide to competitors, *see Iowa Util. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835, leading the Commission to reconsider its position with respect to EEL access. As part of the process of developing new unbundled network element rules, the Commission issued a Supplemental Order expressly authorizing—indeed, mandating—the use restrictions that appellants challenge here. Issued approximately one month before the FCC approved Bell Atlantic's application, the Supplemental Order provides:

> [U]ntil resolution of our Fourth [Further Notice of Proposed Rulemaking], which will occur on or before June 30, 2000, interexchange carriers (IXCs) *may not* convert special access services to combinations of unbundled loops and transport network elements.... This constraint does not apply if an IXC uses combinations of unbundled network elements to provide a significant amount of local exchange service, in addition to exchange access service, to a particular customer.

*In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* 15 F.C.C.R. 1760, 1760 ¶ 2 (1999) ("*Supplemental Order*") (emphasis added), *clarified, In the*

*Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* FCC No. 00–183 (June 2, 2000) ("*Supplemental Order Clarification*"). In other words, the Commission mandated these use restrictions on an interim basis. In a Supplemental Order Clarification, released June 2, 2000, the Commission extended the temporary constraint beyond June 30, "while we compile an adequate record ... for addressing the legal and policy issues that have been raised." *Supplemental Order Clarification* at ¶ 8.

Acknowledging that it had changed its position, the FCC explained that the interim rule "is consistent with the Commission's finding in the Local Competition First Report and Order, that we may, where necessary, establish a temporary transitional mechanism to help complete all of the steps toward the pro-competitive goals of the 1996 Act, including the full implementation of a competitively-neutral system to fund universal service and a completed transition to cost-based access charges." *Supplemental Order,* 15 F.C.C.R. at 1763.¶ 7. Under the Commission's universal service program, local telephone service in high-cost areas is subsidized by incumbent LEC exchange access revenue. The FCC was concerned that if it allowed carriers to bypass special access charges by using network elements to provide their own exchange access, LEC exchange access revenue would decline, thus threatening universal service funding.

In comments opposing Bell Atlantic's application (submitted before promulgation of the Supplemental Order), AT&T, relying on the same reasons the FCC gave in the Local Competition First Report and Order, contended that these use restrictions are unlawful, precluding the Commission's finding that Bell Atlantic provided "[n]ondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 252(d)(1)." 47 U.S.C. § 271(c)(2)(B)(ii). The Commis-

sion responded in the order approving Bell Atlantic's application:

> In the wake of the Supreme Court's January 25, 1999 decision vacating the Commission's Rule 51.319 that identified the network elements incumbent LECs are required to provide on an unbundled basis, and prior to adoption of our order reinstating that rule, the incumbents' obligations with regard to offering unbundled network elements or combinations thereof has been unclear.

*Bell Atlantic,* 15 F.C.C.R. at 4080 ¶ 236 (citing *Iowa Util. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835). "Given this vacuum," the FCC reasoned, "it would be inequitable to penalize Bell Atlantic for complying with the rules established by the New York Commission," which permit these use restrictions. *Id.* The Commission also relied on its determination in the Supplemental Order that the imposition of use restrictions on an interim basis was lawful. *See id.*

Renewing its argument here, AT&T claims that Bell Atlantic's use restrictions violate section 251(c)(3). According to AT&T, the Supplemental Order is unlawful and Bell Atlantic's imposition of use restrictions precludes a finding of checklist compliance. The FCC responds that compliance with Commission orders cannot serve as a basis for rejecting an application. The reason, the FCC explains, is that the statute does not permit appellants in section 271 proceedings to collaterally attack orders or rules adopted by the Commission in other proceedings. Calling its position "prudent," the Commission further argues that "any such challenge could be brought only through a petition for review of the Supplemental Order itself, *see* 47 U.S.C § 402 (a), not as a collateral attack on this section 271 appeal, *see* 47 U.S.C. § 402 (b)(6), (9)." Appellee's Br. at 40. "Because the *Supplemental Order* must be deemed lawful for purposes of this case," the Commission concludes, "Bell Atlantic's use restrictions cannot be a basis

for challenging its section 271 authorization." *Id.*

Since this issue presents a straightforward question of statutory construction, we again invoke *Chevron.* Under *Chevron* step one, the "precise question" is this: In a section 271 proceeding, may an applicant's compliance with a collateral order provide the basis for a finding that the applicant has not "fully implemented the competitive checklist"? 47 U.S.C. § 271(d)(3)(A)(i). Put another way, does the statute require the Commission in section 271 proceedings to entertain challenges to orders adopted in other proceedings? We cannot see how section 271(d)(3)(A)(i) speaks unambiguously to this issue. The section says nothing about what full implementation requires, nor whether the Commission can interpret it as being satisfied by compliance with agency orders.

The question, then, is whether the FCC's interpretation of section 271(d)(3)(A)(i) is reasonable. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. The Commission based its interpretation on the "very unfortunate practical consequences" that would result from adopting AT&T's interpretation of the statute. Appellee's Br. at 41. Under that interpretation, during the ninety-day statutory review period the FCC would have to resolve all collateral challenges to rules and orders issued in other proceedings, and then defend its decision in a section 271 appeal to this court. According to the Commission, this would risk converting "precisely focused, extremely expedited" section 271 "adjudications, as well as this Court's subsequent review proceedings, into forums for the mandatory resolution of major industrywide issues already pending in traditional notice-and-comment rulemaking proceedings." *Id.*

Given the deference we owe the Commission, particularly where, as here, it has made a judgment about the most efficient way to proceed in a complex administrative matter, we find its interpretation of

the statute reasonable. The Commission's concerns about encumbering the ninety-day administrative process and prolonging litigation, thus delaying BOC entry into long distance markets, seem well-founded. Under AT&T's interpretation of the statute, parties to section 271 proceedings could challenge (before both the Commission and this court) virtually every aspect of the agency's local competition regulations—including TELRIC, as AT&T counsel conceded at oral argument. Such a challenge would further complicate these already enormously complex proceedings, requiring the Commission, in addition to resolving the many other issues before it, to present a comprehensive defense of TELRIC, all within the ninety days prescribed by the statute. We would then have to determine whether TELRIC was the appropriate pricing methodology, and in doing so we would create a holding that would supplant any pending petitions for review of the underlying TELRIC orders, at least in this circuit. We thus agree with the FCC that allowing collateral challenges could change the nature of section 271 proceedings from an expedited process focused on an individual applicant's performance into a wide-ranging, industry-wide examination of telecommunications law and policy.

Perhaps allowing substantive challenges to collateral orders would result in speedier realization of competitive local and long distance telephone markets. But the FCC has a different view, and this being a policy judgment, it is for the agency—not this court—to make. "Congress quite clearly gave the Commission the primary responsibility to make delicate judgments under this statute...." *SBC Communications*, 138 F.3d at 421. We are particularly comfortable deferring to the Commission's judgment because the agency adopted the Supplemental Order only as "a limited, transitional plan to address public policy concerns, relating to universal service, raised by the bypass of access charges via unbundled elements." *Cf. Competitive Telecommunications Ass'n v.*

*FCC,* 117 F.3d 1068, 1073–75 (8th Cir.1997) ("*CompTel*").

We do not agree with AT&T that *AT&T v. FCC,* 978 F.2d 727 (D.C.Cir.1992) requires a different result. There, AT&T filed a section 208 complaint challenging a competitor's failure to file a tariff in violation of the Communications Act. The Commission, acknowledging that this court had invalidated a previous order exempting nondominant carriers from filing tariffs, deferred consideration of the "validity" of the policy to a future rulemaking and dismissed AT&T's complaint. *Id.* at 731. Calling the Commission's action an "administrative law shell game," *id.* at 732, we found the dismissal of AT&T's complaint "with only a promise to address the legal issue it raised in a future rulemaking" to be arbitrary and capricious, *id.* at 733.

*AT&T* differs from this case in a fundamental respect. Unlike there, where the Commission dismissed AT&T's section 208 complaint, here the Commission fully considered AT&T's challenges to the Commission's approval of Bell Atlantic's section 271 application. Although the Commission declined to consider AT&T's challenge to the Supplemental Order, there is no evidence that its reason for doing so was, as in *AT&T,* a desire to "avoid judicial review" motivated by a "fear[ ] ... [that the order] cannot withstand judicial scrutiny." *Id.* at 731. Instead, the Commission relied on its view—reasonable, we have held—that section 271 does not permit collateral challenges to Commission orders. AT&T could have challenged the Supplemental Order by filing a petition for review pursuant to 47 U.S.C. § 402(a). In fact, this is exactly what Bell Atlantic and other BOCs did when challenging the TELRIC methodology—they filed a petition for review of the Local Competition First Report and Order, which the Eighth Circuit resolved just days ago. *See Iowa Util. Bd. v. FCC,* 219 F.3d 744 (8th Cir.2000). AT&T may

still be able to challenge the Supplemental Order by filing a section 208 complaint when Bell Atlantic actually refuses to permit it to use EELs to provide long distance service. Thus this case involves neither an "administrative law shell game" nor a "promise to address the legal issue . . . in a future rulemaking." *Id.* at 732–33.

A final note. The parties debate the implications of *CompTel,* 117 F.3d at 1073–75. The FCC argues that the decision supports the interim restrictions authorized by the Supplemental Order. AT&T thinks that *CompTel* was wrongly decided. We need not resolve that debate because the lawfulness of the Supplemental Order is not a proper subject of this section 271 proceeding.

## V

■ This brings us to AT&T's final challenge to the Commission's order. In Bell Atlantic's section 271 application, the company stated its intention to market its affiliate's long distance service to customers who call Bell Atlantic to establish or change their existing local service. Bell Atlantic explained that when it receives calls relating to local service, it will mention its affiliate's long distance service, then offer to read the names of other long distance carriers in random order.

AT&T claims that Bell Atlantic's practice violates section 272(c)(1), which prohibits BOCs from discriminating between their long distance affiliate and other providers of long distance service. *See* 47 U.S.C. § 272(c)(1). Section 272(g)(2), however, expressly permits BOCs to engage in joint marketing. *See id.* § 272(g)(2). Under section 272(g)(3), moreover, "[t]he joint marketing and sale of services permitted under this subsection shall not be considered to violate the nondiscrimination provisions of subsection (c) of this section." *Id.* § 272(g)(3). We read this provision to exempt joint marketing activities from section 272(c)(1)'s nondiscrimination requirement. It is true, as AT&T points out, that section 272(g)(3) is titled "Rule of con-

struction," but we do not see how this alters its clear implications.

AT&T also argues that prior to the 1996 Act the FCC required BOCs to read the names of available long distance carriers in alphabetical order, showing favoritism to none. According to AT&T, because section 251(g) requires BOCs to adhere to all pre-Act nondiscrimination requirements until "explicitly superseded by regulations prescribed by the Commission," 47 U.S.C. § 251(g), BOCs may not deviate from the prior practice of reading the list of all long distance carriers, including themselves, in alphabetical order. The Commission persuasively responded to this issue in its 1997 Order denying BellSouth's South Carolina application:

> [T]he equal access obligations requiring BOCs to provide the names and telephone numbers of interexchange carriers in random order were written at a time when BOCs could not provide (and therefore could not market) long distance services. Now that BOCs . . . are permitted under the Act to market their services jointly, we must harmonize the existing equal access requirements with the right under the Act to engage in joint marketing.

*In the Matter of Application of BellSouth Corp.,* 13 F.C.C.R. at 671 ¶ 238 (footnote omitted).

## VI

Approving a section 271 application requires a delicate judgment about the current state of competition in local markets, as well as how best to foster future competition. The FCC must ensure—as it has in five previous cases—that BOCs failing to comply with the 1996 Act's local competition provisions are not allowed to provide long distance service. The Commission must be equally careful to ensure—as it has in this case—that BOCs that satisfy the statute's requirements are not barred from long distance markets. "Setting the bar for statutory compliance too high

would inflict two quite serious harms," as the FCC points out. Appellee's Br. at 11. "First, it would dampen every BOC's incentive to cooperate closely with state regulators to open its local markets to full competition.... Second, setting the bar too high would simultaneously deprive the ultimate beneficiaries of the 1996 Act—American consumers—of a valuable source of price-reducing competition in the long distance market." *Id.*

We believe that the Commission set the bar at a reasonable height. It demanded real evidence that Bell Atlantic had complied with all checklist requirements, but at the same time, it did not allow "'the infeasible perfect to oust the feasible good.'" *Edison Elec. Inst. v. ICC,* 969 F.2d 1221, 1227 (D.C.Cir.1992) (quoting *Commonwealth of Pennsylvania v. ICC,* 535 F.2d 91, 96 (D.C.Cir.1976)). Given the evidence of growing competition in the New York local telephone market, *see supra* at 9–10, the NYPSC's careful work on a host of technical and complex issues, and the thorough analysis conducted by the FCC in the limited time permitted by section 271(c), we find no basis for faulting the Commission's conclusion that Bell Atlantic satisfied the statute's requirements for entry into the long distance telephone market.

The Commission's order approving Bell Atlantic's application is affirmed.

*So ordered.*