Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 27, 2003        Decided July 1, 2003

No. 01-1461

Z–TEL COMMUNICATIONS, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

AT&T CORPORATION, ET AL.,
INTERVENORS

Appeal of an Order of the
Federal Communications Commission

*Albert H. Kramer* argued the cause and filed the briefs for appellant.

*Rodger D. Citron*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *John A. Rogovin*, Deputy General Counsel, *Richard K.*

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Welch*, Associate General Counsel, and *John E. Ingle*, Deputy Associate General Counsel. *James M. Carr*, Counsel, entered an appearance.

*Leslie V. Owsley* argued the cause for Verizon intervenors. With her on the brief were *Michael E. Glover, Karen Zacharia, Donna M. Epps, Mark L. Evans*, *Colin S. Stretch* and *Scott H. Angstreich.*

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The Federal Communications Commission granted intervenor Verizon's application seeking approval under § 271 of the Telecommunications Act of 1996, 47 U.S.C. § 271, to provide long-distance service to callers in Pennsylvania, where Verizon is the incumbent local exchange carrier. *Verizon Pennsylvania Inc.*, 16 F.C.C. Rcd. 17419 (2001). Z–Tel Communications, a competitive local exchange carrier, challenges the resulting *Order*, maintaining the Commission erred in finding that Verizon provides competitors nondiscriminatory access to its wholesale billing services, as required by the Commission pursuant to § 271. We affirm the *Order*.

## I. Background

We presented a detailed history of § 271 in *AT&T Corp. v. FCC*, 220 F.3d 607, 610–12 (2000), which we shall not repeat here. Suffice it to say that in order for a Bell Operating Company (BOC) to obtain authority to provide inter-LATA (long-distance) service to callers in a region where it provides local exchange service, it must first obtain approval from the Commission. One method of obtaining approval, and the one Verizon pursued in this case, requires the BOC first to apply to the state regulatory agency, which makes an initial determination of the BOC's eligibility. If the state agency approves, then the BOC may file an application with the Commission, which has 90 days in which to evaluate whether the application establishes the BOC's compliance with, among

other things, the "competitive checklist" in § 271(c)(2)(B). The checklist "incorporates by reference many of the substantive requirements of the Act's local competition provisions," *AT&T Corp.*, 220 F.3d at 612, which in turn require the BOC to take various steps to open its market to competitive local exchange carriers (CLECs). In particular, the checklist requires the BOC to provide CLECs with "[n]ondiscriminatory access to [unbundled] network elements" (UNEs). § 271(c)(2)(B)(ii).

The only UNE relevant to this appeal is the Operation Support Systems (OSS) element, which the Commission has described as the various "systems, databases, and personnel" that the BOCs use "to provide service to their customers." *SBC Communications Inc.*, 15 F.C.C. Rcd. 18354, ¶ 92 (2000). The OSS element itself consists of five functions, of which "billing" is one. *Bell Atlantic New York*, 15 F.C.C. Rcd. 3953, ¶ 82 (1999). The billing requirement in turn has two components: the BOC must provide CLECs with "complete and accurate reports on the service usage of competing carriers' customers in substantially the same time and manner that [it] provides such information to itself," and it must provide "wholesale bills in a manner that gives competing carriers a meaningful opportunity to compete." *SBC Communications Inc.*, 16 F.C.C. Rcd. 6237, ¶ 163 (2001). The latter component is the subject of the present dispute.

In June 2001 the Pennsylvania Public Utility Commission approved Verizon's application to provide long-distance services to callers in Pennsylvania, conditioned upon Verizon taking certain further action. In particular, the PUC expressed concern that Verizon be able to provide "timely and accurate electronic bills," and required Verizon to take steps to alleviate that concern.

Verizon provides CLECs in Pennsylvania with bills in two formats: a "retail-formatted bill," generally printed on paper, and a Billing Output Specification Bill Data Tape, or "BOS BDT," which is designed to be computer-readable. Verizon has always provided retail-formatted bills, and their accuracy is not at issue in this appeal. Verizon began offering BOS

BDT bills in January 2000, but it experienced problems, including incorrect charges appearing on the bills, that caused it to suspend BOS BDT billing for several months. It reintroduced BOS BDT bills in October 2000, but some problems remained despite Verizon's continuing effort to fix its software.

In April 2001 Verizon "implemented a process . . . to manually review and adjust the BOS BDT bills to match them to the retail-formatted bills and to reconcile internal inconsistencies." *Order* ¶ 20. Verizon then contracted with PriceWaterhouseCoopers (PWC) to compare its BOS BDT bills with its retail-formatted bills "and to test the readability and auditability of the BOS BDT bill." *Id.* ¶ 21. PWC's studies showed that "the BOS BDT bill is largely comparable to the retail-formatted bill." *Id.* ¶ 35. Meanwhile, Verizon had sponsored a separate study, completed in December 2000 by KPMG Consulting, that found its retail-formatted bills were accurate. Based upon these studies, in May 2001 Verizon offered CLECs the option of treating the BOS BDT bill as their "bill of record." It also continued working to fix its billing system, making changes to its software through June 2001.

Verizon filed its application with the Commission on June 21, 2001. The Commission thereafter received: (1) the comments of Z–Tel and of other interested parties; (2) Verizon's reply comments; (3) the report of the Department of Justice required by § 271(d)(2)(A); and (4) numerous ex parte submissions.

In their comments Z–Tel and certain other CLECs claimed that Verizon had not demonstrated it could deliver an accurate BOS BDT bill and indeed that as of June 2001 it never had delivered such a bill. Z–Tel also claimed that certain "performance metrics" Verizon had submitted in support of its application were inadequate to measure the accuracy of Verizon's billing performance.

Verizon replied on August 17 in an ex parte letter containing additional data and arguments, three aspects of which are noteworthy. First, Verizon provided a table showing the rates of error in its bills had decreased from approximately

27% in February to about 2% in May and June. Second, Verizon's data showed the error rates in what the Commission called Verizon's "historic problem areas" had also dropped over time. Finally, Verizon submitted a "recalculation" of certain of the billing performance metrics.

In the *Order* approving Verizon's application, the Commission found that "despite some historical problems in producing a readable, auditable and accurate wholesale bill ... Verizon now provides a wholesale bill that gives [CLECs] a meaningful opportunity to compete." *Order* ¶ 15. Although the Commission considered "commercial performance data" to be the "most persuasive form of evidence," it determined that in this case it could not rely exclusively upon such data because "Verizon has made significant changes to its wholesale billing systems in the most recent months leading up to [its] application." *Id.* ¶ 24. The Commission did consider Verizon's commercial performance data to the extent that, in response to the commenters' objections based upon the bills they had received from Verizon, it cited the February through June downward trend in error rates as evidence that Verizon's software fixes had improved its performance "to the point where error rates no longer differ materially from wholesale billing data for those states in which BOCs have already received section 271 authority." *Id.* ¶ 26. The Commission also relied upon the PWC and KPMG studies, *id.* ¶¶ 31–36, Verizon's recent software fixes, and its manual review process, *id.* ¶ 38, as evidence that Verizon had brought its billing performance up to an acceptable level.

## II. Analysis

In this appeal, Z–Tel maintains that for several reasons the *Order* was arbitrary, capricious, and contrary to law. We consider and reject each of Z–Tel's arguments below.

## A. Complete When Filed

Z–Tel claims the Commission violated its own procedural rules by considering evidence that was not properly before it. The Commission's stated policy is as follows:

> We expect that a section 271 application, as originally filed, will include all of the factual evidence on which the applicant would have the Commission rely in making its findings thereon. In the event that the applicant submits . . . factual evidence that changes its application in a material respect, the Commission reserves the right to deem such submission a new application and start the 90–day review process anew.

*Procedures for Bell Operating Company Applications Under New Section 271*, Public Notice, 11 F.C.C. Rcd. 19708, 19709 (1996). This formulation, known as the "complete when filed" rule, reserves to the Commission considerable discretion to determine whether to reject late-filed evidence. *Bell Atlantic New York*, 15 F.C.C. Rcd. 3953, ¶ 35 ("our precedent makes clear that this rule is a discretionary one"). Moreover, the rule contains an exception:

> [An applicant] may submit new factual information after the application is filed, if the sole purpose of that evidence is to rebut arguments or facts submitted by other commenters [and the new evidence] cover[s] only the period placed in dispute by commenters . . . .

*SBC Communications Inc.*, 15 F.C.C. Rcd. 18354, ¶ 35. *See Updated Filing Requirements for Bell Operating Company Applications Under Section 271 of the Communications Act*, Public Notice, 16 F.C.C. Rcd. 6923, 6925–26 (Common Carrier Bureau 2001) (*Updated Filing Requirements*) (restating the rule and exception).

Z–Tel claims the Commission violated the complete when filed rule by considering Verizon's August 17 submission as a basis for granting its application. Instead of forcing Z–Tel and other interested parties to attempt to tailor their comments to a "moving target," it complains, the Commission should have required Verizon to withdraw its application and submit anew. Z–Tel also argues that Verizon's August 17 submission was objectionable because it included billing data for the month of June, which Verizon generated after it had filed its application with the Commission.

The Commission addressed each of these objections in the *Order*. With respect to the complaint that consideration of evidence in the August 17 submission violated the complete when filed rule, the Commission ruled the data were admissible because they fell within the exception described above: "the evidence we rely on was submitted by Verizon to rebut competitors' assertions and pertains only to the May and June billing cycles." *Order* ¶ 7 n.20. With regard to the inclusion of June data that post-dated the filing of Verizon's application, the Commission pointed out that it "ha[d] previously considered performance that covered a time period slightly beyond the comment filing date," and it "believe[d] it [was] appropriate to do so here." *Id.* ¶ 7 (citing *SBC Communications Inc.*, 15 F.C.C. Rcd. 18354, ¶ ¶ 39–40). In fact the performance data for June did not extend beyond the date for filing comments, which was July 11, but some of it did cover a period beyond the date of the application (June 21), which no doubt explains the Commission's understanding, further discussed below, that it was departing from strict adherence to the complete when filed rule.

Verizon's submission of August 17 clearly comes within the exception to the complete when filed rule. Z–Tel and other commenters had challenged Verizon's billing performance for the months of May and June, *e.g.*, Comments of Z–Tel (July 11, 2001) 8; Rubino Decl. ¶ 5; Reply Comments of Z–Tel (Aug. 6, 2001) 5, and Verizon was merely responding, defending its billing performance for those months by showing its error rate was lower than it had been before. The submission therefore met the Commission's requirements that newly-filed evidence "rebut arguments or facts submitted by other commenters" and "cover only the period placed in dispute by commenters."

Z–Tel contends that even if the Commission could properly consider Verizon's August 17 submission under the exception to the complete when filed rule, the exception limits the Commission to considering data solely for the purpose of rebuttal. Therefore, Z–Tel argues, Verizon's late-filed submission could at best rebut complaints from commenters that its billing performance in May and June was inadequate; the

Commission could not rely upon the late-filed data to find Verizon's billing performance was adequate. As authority for this proposition Z–Tel cites the Commission's prior statements to the effect that an applicant should include in its application "all of the factual evidence on which the applicant would have the Commission rely." *Procedures for Bell Operating Company Applications Under New Section 271*, 11 F.C.C. Rcd. at 19709; *Updated Filing Requirements*, 16 F.C.C. Rcd. at 6925; *see also id.* at 6926 ("It generally will not be appropriate for an applicant to make any part of its initial *prima facie* showing for the first time in reply comments or in *ex parte* submissions, although there may be limited exceptions to this rule").

The statements Z–Tel cites all indicate the Commission might refuse to grant a § 271 application if the applicant first presents evidence of its compliance with a checklist item in its reply comments, but they also indicate the Commission retains the power to make reasoned exceptions to the rule. In this case, the Commission chose not to segregate the evidence before it into data that may permissibly be used to establish a prima facie case and data that may be used only in rebuttal. Because "[n]either the June carrier-to-carrier performance data nor the data reflecting Verizon's June billing performance . . . could be generated until the end of the calendar month," and because no "party to [the] proceeding [was] prejudiced" by its consideration of the data, *Order* ¶ 7, the Commission indicated that it would waive the aspect of the complete when filed rule providing that late-filed information can be used only for the purpose of rebuttal. We find this approach eminently reasonable. It is neither arbitrary nor capricious for the Commission to consider any evidence that is properly before it for any purpose as to which it is probative. *See Greyhound Lines, Inc. v. ICC*, 667 F.2d 151, 152–53 (D.C. Cir. 1981) ("the courts have long recognized that evidentiary rules used in judicial proceedings do not control the more flexible administrative process").

**B. Billing Metrics**

Z–Tel also argues the Commission acted arbitrarily and capriciously by not giving any weight to the recalculated billing metrics Verizon submitted as part of its August 17 submission. According to Z–Tel, they show Verizon made many more errors in billing CLECs than it made in billing its own customers.

In the *Order* the Commission noted both that the CLECs had challenged the soundness of certain of the billing metrics and that "Verizon itself acknowledges some of the metrics' flaws." *Order* ¶ 41 n.157. The Commission concluded by noting:

> Until July . . . the billing accuracy and timeliness metrics did not apply to Verizon's BOS BDT bills. Verizon generally does not rely on its wholesale billing performance metrics to establish its affirmative case. In these circumstances, we do not rely on the billing accuracy metrics in considering Verizon's section 271 showing.

*Id.* Z–Tel's complaint is that the Commission cannot ignore evidence unfavorable to an applicant merely because the applicant itself did not rely upon it; rather, Z–Tel claims, the Commission must consider all probative evidence properly put before it, regardless whether the applicant has relied upon it.

Z–Tel's point, which may well be correct as a general proposition, does not advance its cause here because the billing metrics in question were not, as calculated, indicative of the contemporaneous error rate. To be specific, the billing accuracy metrics, which are the metrics Z–Tel claims undermine Verizon's application, are calculated as fractions:

> The numerator of the bill accuracy metrics [(BI–3)] is the total amount of dollars credited to CLECs as a result of billing errors in the reporting month, regardless of when the CLEC submitted the claim for the error or what month(s) the error occurred in. The denominator is the current charges billed to CLECs in the reporting month. . . . [T]his means that the credits reported in a

> month do not relate to the charges billed in that month....

McLean/Wierzbicki/Webster Reply Decl. (Aug. 6, 2001) 24 ¶ 54. As Z–Tel itself as well as other commenters pointed out, the result of this arrangement is that the billing metrics "won't capture failures for many months." Z–Tel Ex Parte (Aug. 17, 2001) at 4. And as became clear at oral argument, the numerator for a given month may contain credits issued for that month, for one or more prior months, or for no months, depending upon the vintage of the billing disputes Verizon and the CLECs happened to resolve that month. Because of this and other limitations, Z–Tel informed the Commission that "Verizon's billing performance metrics produce no substantive information." *Id.*

Although Z–Tel later argued to the Commission that the recalculated billing metrics Verizon submitted on August 17 remedied some of the problems with those metrics – in particular, Verizon's "placing CLEC billing errors in the wrong performance reports," Z–Tel Ex Parte (Sept. 6, 2001) at 2 n.1 – it did not claim that Verizon had solved the underlying structural problem with the metrics. The Commission did not go into great detail about its reason for not relying upon the billing metrics, but what it did say is both clear and sound: "competitive LECs allege" the billing metrics are inaccurate, *Order* ¶ 41 n.157; "Verizon itself acknowledges some of the metrics' flaws," *id.*; "Verizon generally does not rely" upon the metrics, *id.*; therefore neither would the Commission rely upon them.

In its reply brief to this court Z–Tel now claims that Verizon's recalculation of the metrics corrected their "primary problem." It appears to us, however, that the structural problem with the metrics, namely the unpredictable but possibly significant lag between any error and its reflection in the billing metrics, is at least as serious. Certainly Z–Tel did not indicate in its comments to the Commission that this was a lesser problem. Under these circumstances, we do not fault the Commission for declining to rely upon data that the parties agreed had significant problems.*

---

\* Z–Tel argues, also in its reply brief, that because Verizon's billing of CLECs has consistently grown over the period during

### C. Balancing the Billing Factors

As mentioned above, the billing function of the OSS UNE has two components: service usage reporting and wholesale billing. Z–Tel argues the Commission permitted Verizon's questionable performance in the second component to be offset by its strong performance in the first. This is impermissible, Z–Tel claims, because the *Order* itself stated that the "two essential billing functions" serve "two different purposes" and are measured in different ways; *Order* ¶ 13; it is therefore arbitrary and capricious to make up a shortfall in one with a surplus in the other.

In response the Commission defends its authority to engage in the balancing Z–Tel alleges. It cites our decision in *AT&T Corp.*, 220 F.3d at 624, for the proposition that it may perform an overall evaluation of a BOC's performance with respect to a single UNE rather than evaluating each subelement separately. In *AT&T Corp.* we deferred to the Commission's interpretation of § 271 to the effect that a BOC need not show that it provides nondiscriminatory access to a particular type of service loop when the BOC had shown that it provided nondiscriminatory access to loops in general. *Id.*

It is not clear whether the reasoning of *AT&T Corp.* applies here because the Commission has limited its own discretion by setting individual standards for wholesale billing and service-usage reporting. We need not decide whether § 271 permits balancing in this case, however. Z–Tel cites two passages in the *Order* under review, neither of which convinces us that the Commission in fact balanced a shortfall in Verizon's wholesale billing performance against its service usage performance.

which the billing metric was calculated, the denominator of the billing metric has consistently grown, too, thereby skewing the metric. The longer the delay before a given error is credited to a CLEC, the argument goes, the smaller the effect that error produces upon the billing metric. The result is that the billing metric systematically understates Verizon's error rates. This argument is not properly before us because Z–Tel did not present it to the Commission. *See* 47 U.S.C. § 405(a)(2).

The first passage Z–Tel cites (in ¶ 15 of the *Order*) provides no support whatsoever for its argument. There the Commission stated it "believe[s] that Verizon ultimately satisfies its evidentiary burden for wholesale billing and, in combination with its strong [service usage] performance, complies with the OSS billing requirements." The context makes clear that the Commission independently evaluated Verizon's wholesale billing performance and its service usage performance. In ¶ 13 of the *Order* the Commission lists the two OSS billing requirements: service usage and wholesale billing. Because Verizon's service usage performance was excellent, the Commission discussed it only in ¶ 14, concluding that "Verizon provides its competitors with non-discriminatory access to service usage data." Verizon's wholesale billing performance was a much closer issue, which the Commission discussed at length (in ¶ ¶ 15–42). The Commission provided a preview of the result in ¶ 15, however: Verizon "satisfies its evidentiary burden for wholesale billing and," because it had already satisfied its burden for service usage, it "complies with the OSS billing requirements."

The other passage Z–Tel identifies is in ¶ 37 of the *Order*:

> Ultimately, the competitive LECs challenging Verizon's wholesale billing performance contend that, despite improved performance in billing accuracy, Verizon's recent improvements to its BOS BDT billing system have not been sufficiently commercially tested. According to these parties, we should insist on reviewing several months of commercial performance evidence to determine whether Verizon's latest modifications have sufficiently improved the manner in which Verizon bills its wholesale customers. As stated above, although we acknowledge that the evidentiary showing that Verizon relies on makes this issue a close call, we find the evidence minimally sufficient, especially in light of the showing it has made for billing as a whole.

Z–Tel argues that by "the showing [Verizon] has made for billing as a whole" the Commission could only have meant Verizon's showing with regard to the other aspect of the

"billing" function of OSS, namely service usage reporting. Although that is one possible reading of the sentence, we do not think it is a required one. As we explained above, "billing" is one of the requirements of OSS, and "wholesale billing" is one of the components of "billing." The Commission and the commenters discussed various aspects of "wholesale billing": BOS BDT billing versus retail-formatted billing, billing timeliness versus billing accuracy, and so on. The word "billing," when used in connection with § 271 proceedings, simply has too many layers of meaning to assume, as Z–Tel does, that by "billing as a whole" the Commission meant the billing function of OSS.

Moreover, the words "as stated above" can refer only to the Commission's statement in ¶ 15: "Although as an evidentiary matter this finding is a close call, we believe that Verizon ultimately satisfies its evidentiary burden for wholesale billing and, in combination with its strong [service usage] performance, complies with the OSS billing requirements." As already discussed, this statement does not support Z–Tel's position at all. In short, although ¶ 37 is not clear when viewed in isolation, the Commission had already stated in ¶ 15 it was evaluating service usage performance and wholesale billing performance independently, just as Z–Tel argues it should have done. No harm, no foul.

## D. Additional Comfort

Z–Tel also objects to the *Order* insofar as the Commission stated that it gained confidence in Verizon's compliance with the checklist based upon cited evidence that was not properly in the record (because it was submitted too late). Specifically, the Commission stated in a footnote that "information about . . . billing cycles [after June] does provide additional confirmation of Verizon's satisfaction of its obligations under section 271(c)." *Id.* ¶ 7 n.20. Elsewhere the Commission stated that it took "additional comfort" and gained "additional confidence" from Verizon's "voluntarily committing to a series of undertakings aimed at ensuring continued acceptable performance." *Id.* ¶ 41. Although the Commission explicitly stated in the *Order* that it was not relying upon this evidence,

*id.*, Z–Tel nevertheless insists the Commission's "unacknowledged reliance" upon evidence not properly before it requires reversal.

As the Commission points out, Z–Tel's argument is foreclosed by *AT&T Corp.*, 220 F.3d at 625. The appellants in that case made a similar argument about similar statements in the similar order there under review. We took the Commission at its word when it similarly stated in the order that it was not relying upon evidence it had described as providing it with "further assurance." *Id.* So, too, in this case, though we do hope the Commission avoids in the future the necessity to distinguish between deriving additional comfort from, and relying upon, evidence not properly before it.

### E. Department of Justice Report

Section 271(d)(2)(A) of Title 47 requires the Commission, in deciding whether to grant an application under § 271, to consult with the Attorney General and to "give substantial weight to the Attorney General's evaluation, but such evaluation shall not have any preclusive effect on any Commission decision." The evaluation the Department of Justice submitted in connection with Verizon's application concluded that "one important issue remains unresolved," that is, "Verizon filed its Pennsylvania application with the FCC without sufficient evidence to show that numerous problems with its wholesale billing systems have been corrected." *Evaluation of the U.S. Dep't of Justice* 2, 3. The Department went on to say that it "realizes . . . the Commission is likely to have further information prior to reaching a decision in this matter. Accordingly, we do not foreclose the possibility that the Commission may be able to approve Verizon's application at the culmination of these proceedings." *Id.* at 3.

Z–Tel argues the Commission failed to give this evaluation "substantial weight." It reasons that (1) Commission precedents preclude finding an application complies with § 271 in the face of a contradictory evaluation by the Department of Justice unless the applicant files additional evidence; (2) the filing of any additional evidence would be a violation of the complete when filed rule (an argument of which we have

already disposed); and (3) the Commission could not consider additional evidence anyway because to do so would involve "consider[ing] evidence not in the record at the time of the DOJ consultation."

Z–Tel's first contention, the validity of which we shall assume for the sake of the argument, is irrelevant in this case because the Commission did consider other evidence to which the Department was not exposed, on the basis of which it came to a different conclusion – a possibility expressly anticipated in the Department's report. To hold that the Commission's consideration of such evidence deprived the Department of a meaningful opportunity to comment upon the application would be to elevate the status of its report from advisory to controlling, contrary to the expressed intention of the Congress. *See* 47 U.S.C. § 271(d)(2)(A); *AT&T Corp.*, 220 F.3d at 627.

### F. Weight of Commercial Performance Data

Z–Tel also claims the Commission did not follow its own stated practice, reiterated in this very case, *Order* ¶ 24, of giving greater weight to "commercial performance data" than to other types of information. Because, Z–Tel claims, the commercial performance data before the Commission demonstrated that Verizon's billing practices were inadequate, the Commission erred when it relied upon "third-party testing" – the PWC and KPMG studies – to grant Verizon's application.

As the Commission explained in the *Order*, however, it determined only that it could not rely "exclusively" upon "past commercial performance data because . . . Verizon has made significant changes to its wholesale billing systems in the most recent months leading up to [its] application." *Id.* The Commission nevertheless did rely upon past commercial performance data to some extent. *Id.* ¶¶ 25–30. The Commission has considerable discretion in weighing the evidence before it. *AT&T Corp.*, 220 F.3d at 616. Insofar as the Commission is bound by previous statements of how it weighs evidence, the Commission adequately explained any departure from past practice in this case.

### G. Sufficiency of the Evidence

Finally, Z–Tel maintains the Commission erred in finding Verizon presented evidence sufficient to justify a determination that its wholesale billing complied with the requirements of § 271. Initially we note that the parties disagree about the standard of review. The Commission lays claim to the "special deference" we gave it in reviewing the § 271 proceeding in *AT&T Corp.*, 220 F.3d at 616; Z–Tel implicitly disagrees by arguing there is "not substantial evidence to support the grant of the Application."

We need not decide whether the "special deference" to which we referred in *AT&T Corp.* is applicable in this case because the Commission's decision is supported by substantial evidence, conventionally conceived. The Commission based its decision to grant Verizon's application upon the February through June trend data, *Order* ¶ ¶ 26–27, the PWC and KPMG studies, *id.* ¶ ¶ 31–36, and evidence of Verizon's software fixes and manual review process, *id.* ¶ 38. These submissions provide substantial evidence supporting the Commission's finding that Verizon is able to deliver a BOS BDT bill that is readable, accurate, and auditable. The February through June data showed that the dollar value of all disputes submitted by CLECs, expressed as a percentage of the dollar value of their bills, decreased from approximately 27% in February to approximately 2% in June. The May and June dispute rates compared favorably to the rates in New York, where Verizon had already received § 271 authority. Moreover, the rate for certain types of errors in what the Commission identified as Verizon's "historic problem areas," *id.* ¶ 26, also declined – indeed, to amounts that the Commission reasonably found were "relatively nominal both in dollar value and as a percentage of current charges billed." *Id.* Verizon's software fixes and manual review process provided an explanation for this trend of marked improvement and suggested it was likely to continue. Finally, the third-party studies indicated that Verizon's BOS BDT data were readable and auditable.

Z–Tel does not challenge the Commission's findings head-on. Instead it argues that (1) the Commission ignored problems that would make it more difficult for CLECs to audit their bills; (2) the PWC studies should not have been given significant weight because their results were neither detailed nor unequivocal; and (3) the "avalanche" of critical comments that it and other CLECs submitted outweighed any favorable data submitted by Verizon. None of these arguments amounts to anything. As for the first point, the Commission addressed the auditing problems (in ¶ 39 of the *Order*), agreeing with CLECs that at that time "a precise accounting for all possible charges" was not possible, but noting that the "amounts involved . . . [were] nominal and [had] been consistently decreasing." The second point goes principally to the weight of the evidence, a matter peculiarly within the province of the Commission, which resolved it reasonably. *See Order* ¶¶ 35–36. The third point is essentially a challenge to the Commission's decision to weigh recent data more heavily than older data – a reasonable approach if ever there was one.

Z–Tel's final effort to exclude the February through June trend data is its claim the Commission's rules require any data submitted to the agency be supported by an affidavit and accompanied by an explanation of how they were produced. *See Updated Filing Requirements*, 16 F.C.C. Rcd. at 6926. The February through June trend data were contained in Verizon's August 17 submission, an unsworn letter signed by Dee May, Verizon's Executive Director for Federal Regulatory matters.

This objection has been forfeit. There is no indication any commenter drew it to the attention of the Commission until the matter reached this court. We shall not reverse the Commission for failing to follow one of its own procedural rules when that failure was not the subject of an objection by any interested party. *See* 47 U.S.C. § 405(a)(2).

### III. Conclusion

For the foregoing reasons the Order of the Commission is

*Affirmed.*